**In re MGM GRAND HOTEL FIRE LITIGATION.**

**MDL No. 453.**

United States District Court, D. Nevada.

March 17, 1987.

John J. Cummings, III, New Orleans, La., Stanley M. Chesley, Cincinnati, Ohio, Wendell H. Gauthier, Kenner, La., Melvin M. Belli, San Francisco, Cal., Toxey H. Smith, Los Angeles, Cal., Will S. Kemp, Las Vegas, Nev., Joseph W. Cotchett, San Mateo, Cal., Leonard M. Ring, Chicago, Ill., J. Bruce Alverson, Las Vegas, Nev., Joseph Weiner, Philadelphia, Pa., for plaintiffs: Plaintiffs' Legal Committee.

Allan B. Goldman, Los Angeles, Cal., Stephen L. Morris, James Olson, Las Vegas, Nev., for MGM.

Leland Eugene Backus, A. William Maupin, Las Vegas, Nev., for Taylor Const. Co.

Rex Jemison, Corby Arnold, Las Vegas, Nev., for Martin Stern, Jr., AIA Architect d/b/a Martin J. Stern Architect and Associates.

G. Edward Fitzgerald, Richard McKnight, Los Angeles, Cal., for California Electric Const. Co.

Samuel A. Harding, Las Vegas, Nev., for Continental Mechanical Corp.

Nicholas W. Hornberger, Los Angeles, Cal., for Otis Elevator Co.

James F. Pico, Las Vegas, Nev., for Clark County Departments and Political Subdivisions.

John F. O'Reilly, Las Vegas, Nev., for W.J. Thompson, Inc.

Duane Tewell, Seattle, Wash., for Simpson Timber Co.

Samuel T. Rees, Beverly Hills, Cal., for Cadillac Plastic and Chemical Co.

Tom H. Foulds, Seattle, Wash., for American Protection Ins. Co., Lumbermens Mut. Cas. Co., Kemper Corp., American Motorist Ins. Co., American Manufacturers Mut. Ins. Co., and American Protection Ins. Co.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is Plaintiffs' Legal Committee's petition for an award of attorney fees and costs. For the reasons stated herein, the petition will be granted.

Plaintiffs' Legal Committee ("the PLC"), appointed by this court in court Order No. 8, filed August 13, 1981, seeks an award of attorney fees of 7% of the gross recovery of "global settlement" funds and for costs for services rendered and costs incurred on behalf of all plaintiffs in the above-captioned litigation from the commencement of their services to date. The gross recovery, the total amount of the now final global settlement, with interest, is in excess of $205,000,000.00.[1]

A description of the course of this litigation and the factual elements and relative rank of each of the parties and interests, whether they be plaintiffs' or defense interests, as well as a summary of the progress of the litigation, appears in the court's Order No. 376, 570 F.Supp. 913 (D.Nev.1983), which the court incorporates herein by reference. The court also incorporates by reference court Order No. 420, filed March 15, 1984, which contains an important discussion of the concerns and difficulty faced in determining the PLC fee in this case.[2]

The PLC previously filed motions for an award of attorneys' fees and costs on December 24, 1985, and again on May 15, 1986, in respect to which argument and evidence was heard at a hearing and a pretrial conference held on January 7, 1986 ("Pretrial Conference No. 17") and May 13, 1986 ("Hearing On Motions") respectively. At Pretrial Conference No. 17 the interested parties were granted leave to file supplemental briefs and the court took the motion under advisement and awaited that additional paperwork. The second motion was filed on May 15, 1986. The court considered the motions as well as the oppo-

---

1.

| | | |
|---|---|---|
| A. | Total receipts through 7/31/86 (Coopers & Lybrand Audit Report marked PLC Exhibit #15 filed 10/15/86) | $203,393,228.00 |
| B. | Final Del Webb payment in 9/86 | 2,000,000.00 |
| C. | Continental Mechanical Corp. payment 11/86 | 400,000.00 |
| | Gross global settlement funds | $205,793,228.00 |
| D. | Pre-global settlements | 17,592,841.00 |
| | Total settlement | $223,386,069.00 |
| E. | The PLC seeks 7% of $205,000,000.00 and no increase from the "pre-global"settlements of $17,592,841.00. | |

2. The last fee distribution was from the American Bank Fee Account. The cut-off date for that calculation was March 1, 1984, at which time the court was advised that approximately $7,058,000.00 was on hand. As of March 1, 1984, $119,782,500.00 had been deposited but because of the deposits in trust funds, the fee was calculated on $116,988.357.00. (Five percent (5%) of this latter figure equals $5,849,-417.87.) Added to this figure by Order No. 417 was $962,594.06. This figure represents "pre-global" deposits in the amount of $898,461.77, plus $64,132.29 interest thereon (pre-global settlements were assessed between 5% and 7%). There was also interest on the $5,849,417.87 of $244,564.34. These sums equaled $7,056,576.24. To this sum the court added $420,000.00 from the All-Flex contribution and $1,250,000.00 from the then unpaid $25,000,000.00 MGM payment. See Order No. 420 filed March 15, 1984.

sition arguments and documents and ruled that notice and a more detailed petition articulating in greater precision the exact claim the PLC was making was required so that all plaintiffs' attorneys who could be affected by the fee petition would have a full understanding of the claim. *See* Order No. 746, filed August 20, 1986.

The PLC then filed the instant petition and new evidence and arguments were introduced and heard at Pretrial Conference No. 19 in Las Vegas on October 15 and 16, 1986.

The only opposition to the PLC petition comes from private plaintiffs' attorneys, Sybil A. Davis, Esquire, Michael McGill, Esquire, F. Lee Bailey, Esquire, Aaron J. Broder, Esquire, Ray LaPica, Esquire, and William Sampson, Esquire. Ms. Davis represents Wendell B. Will, guardian of the estates of Allison Ann Thompson and Kristie Lynn Thompson and administrator of the estates of Tommy G. Thompson and Dianne Kay Thompson. Mr. McGill represents Erik D. Nilsson, individually and as executor of the estates of Donald C. Nilsson and Janet T. Nilsson, and Thomas C. Nilsson and Carol J. Nilsson. Mr. F. Lee Bailey and Mr. Aaron Broder represent Wayne Bailey, Estate of Dorothy Burdzinski, Estate of Willie Lee Duncan, Alice Kiel, Duane Sinatra, Ida Vellone, Joseph Vellone, Donna Wilson, Jean Wilson, Jorge Zairik Simon and Mirna Zairik Salomon. Mr. Ray LaPica represents the Herring Family. Mr. William Sampson represents Ester, Salvador, Elias, Jack, Celia and Mario Galico.

Two other attorneys, James L. Fetterly and Neil G. Galatz, both representing Grand Hotel Valet Services, Inc.; Clocks, The Time and Place, Ltd.; The Teepee, Inc.; La Grande Jewels Corporation, Inc.; MGM Grand Florists, Inc.; James H. Smith; The Travelers Insurance Companies; Florist Mutual Insurance Company; Fireman's Fund Insurance Companies; State Farm Fire and Casualty Company; and Those Underwriters at Lloyds' London, indicated in a petition filed on October 15, 1986, that their eleven plaintiff clients support the PLC's petition provided that their clients who suffered property losses be fully compensated for their actual calculated losses. As stated in Order No. 762, filed on November 21, 1986, which vacated Order No. 758, the court will consider the October 15, 1986 petition of counsel for those eleven plaintiffs as a form of "objection," albeit a qualified one, to the PLC's instant petition for an award of attorney fees and costs.

The sole objection of the attorneys who object to the PLC fee petition is to the PLC receiving a fee of 7% of the recovery as opposed to 5% of the recovery.

In Order No. 764, filed on December 22, 1986, the court created a fund of approximately $7,060,000.00 from which the PLC fees may be paid should the court grant the instant fee petition.[3]

## DISCUSSION

■ If the court denied the PLC fee petition, the PLC would receive attorney fees in the amount of 5% of the gross recovery and the individual private attorneys (non-PLC attorneys and PLC attorneys when not considered in their capacity as PLC members) would receive a maximum of 28⅓% of their clients' gross recovery, with the PLC attorney fees and non-PLC attorney fees totalling a maximum of 33⅓% by reason of this court's Order No. 399 that limited the total fee to be paid by any plaintiff to be 33⅓% of a recovery due that plaintiff. If the court grants the PLC petition, the PLC will receive 7% of the gross recovery as attorney fees and the non-PLC attorneys will receive a maximum of 26⅓% of their client's gross recovery as attorney fees, with the PLC attorney fees and non-PLC attorney fees again totalling a maximum of 33⅓% of each plaintiff's gross recovery. The court has the right

---

**3.** In Order No. 764, filed December 22, 1986, the court stated at page 2, "[t]he court creates a fund of $7,060,000.00 from which the Plaintiffs Legal Committee fees may be paid. Any sums not paid in fee, by separate order, from this fund will be returned to the *general fund* and distributed at the time of the final distribution." (Emphasis added). The two words emphasized above, "general fund," were mistakenly used. In place of those words should be the words, "attorneys from whose fees the fund was created."

and the duty to establish equitable fees for all of the attorneys and has done so previously in this case.

█ The PLC points out various facts which put their petition into context vis-a-vis other court awards of attorneys' fees. This is a fund creation case, a pure fund-in-court case, not a statutory fee case. The disposition of the instant PLC fee petition could not impose additional liability on the defendants; nor does it affect any defendant in any other way. Regardless of which way the court disposes of the PLC fee petition, the fund which will be available for distribution to plaintiffs in the personal injury and death claim cases will be greater as to each plaintiff than the amount that each such plaintiff originally agreed to accept in settlement of that plaintiff's claim. Granting the PLC's petition will not work to take money away from the plaintiff beneficiaries of the recovery fund. The total amount of attorneys' fees to be allowed under the court's Order remains unchanged at 33⅓% of each plaintiff's ultimate gross recovery. The eleven plaintiffs who claimed property damage and are represented by Mr. Fetterly and Mr. Galatz will receive 100% of what they agreed to accept in settlement which is 25% of their original claims. In the personal injury and death claim cases, the vast majority of the cases, plaintiffs will receive over 128% of what they originally agreed to receive. *See* Order No. 375, filed July 12, 1983.

The effect of granting all or any part of this fee petition would thus be best characterized as fee shifting from the plaintiffs' individual attorneys to the PLC.[4]

The court's original award of fees to the PLC in this matter was an amount equal to 5% of the total gross recovery. *See* Pretrial Memorandum Order No. 420, filed March 19, 1984. As this court acknowledged and emphasized in Order No. 420,

the 5% figure was in the court's view below what would normally be expected by the application of standard principles for attorneys' work in class action-type litigation. *Id.* at pages 4, 7 and 8. At the time the court entered Order No. 420 neither the court nor anyone involved with this case contemplated the ultimate reality that the PLC would produce such vast additional funds well above the agreed global settlement figure of $134,887,992.00.

In court Order No. 8, filed August 13, 1981, which was during the time the PLC was being formed and beginning its work, the court stated in paragraph O:

In addition to the reimbursement to the committee of such sums, the court, at times that the court deems appropriate in the future, and upon notice to all parties, will consider the payment of interim and final fee for services performed by committee members for and on behalf of the committee pursuant to this Order. Any such fee approved and to be awarded to the members of the committee shall be based upon the nature and quality and extent of the services rendered, the benefits conferred, the results achieved, and any other item that at the time appears to be fair, reasonable and equitable. . . .

In court Order Nos. 75 and 420 the court considered the payment of interim and final fees to the PLC. The court, in Order No. 75, filed on February 18, 1982, established 5% as the interim PLC fee, the amount that would be deducted from each plaintiff's recovery in this case by way of settlement, which percentage was to be set aside into a fund that was ultimately to be used to satisfy petitions filed by members of the PLC for attorneys' fees for PLC work. An additional sum of 1½% was allocated to be set aside in a fund to be available for application by PLC members for costs and expenses incurred in fulfilling PLC work.

---

**4.** One of the bases for the objection raised by those opposed to the PLC fee petition is that the members of the PLC represent a substantial number of the total claims and, therefore, they should not be compensated from non-PLC case fees. That argument recognizes the fact that the PLC will, in any event, be paying a significant portion of its own fee from the substantial number of claims being handled by its individual members. In this regard, much of the fee shifting from the individual attorneys (non-PLC members and PLC members but not in their PLC capacity) to the PLC, is shifting from a PLC member when not in his PLC capacity to him when in his PLC capacity.

The instant PLC petition only seeks an increase in PLC *fees*, not costs or expenses. With one exception, the basic 5% PLC fee established in Order No. 75 was carried forward as the PLC fee in Order No. 420. The one exception was a 17% PLC fee applied to the amount received from third-party defendant Alflex Corporation. *See* Order No. 420, footnote at page 8 for the explanation for this calculation. The court must now decide the final PLC fee in this case because the case is at an end.

The PLC has fully complied with the terms and conditions set out in paragraph 3 of Order No. 75, and paragraphs 4(N) and 4(O) of Order No. 8. The PLC has rendered from the date of its appointment in 1981, continuous, loyal, highly professional, and extraordinary services, and as a result created an extraordinary fund to be distributed to each plaintiff that is, in each case, more than the plaintiff agreed to accept in settlement, and of equal importance, recovered and distributed in an unprecedentedly short time when the magnitude of this case is considered.

When calculating a fee under the "common fund doctrine," "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984).

In considering the PLC final fee petition the court has been guided and influenced by an evaluation of the following factors: (1) the particular and unique circumstances of this case; (2) fairness to the fund beneficiaries; (3) the amount of work performed by the PLC; (4) the number of hours worked by the PLC; (5) the nature and quality of the PLC's work; (6) the extraordinary efforts of the PLC; (7) the risks the PLC faced early on in the litigation; (8) the speed and efficiency with which the PLC accomplished the settlement; and (9) the extraordinary and exceptional recovery itself.

What follows is a brief list and discussion of facts which the court finds exemplify most of the above mentioned factors evaluated by the court.

The PLC established and maintained an office and staff in Las Vegas throughout the litigation, as well as a residence for PLC use in both Las Vegas and Philadelphia.

Many of the attorneys who ultimately became PLC members of the 12 member committee conducted an extensive on-site investigation at the MGM Grand Hotel in Las Vegas and hired, at their expense, experts to study the site before the demolition and rebuilding of the affected areas of the hotel. The PLC recovered over 6,000 objects from the fire site and stored and used them in a joint warehouse depository during the course of this litigation. It hired some of the best experts in the nation to test various products found in the hotel at substantial expense and retained an "in house" expert to coordinate all experts and supervise a substantial regimen of testing. The PLC established a document depository, reviewed (which included cataloguing and some microfilming) over 4,000,000 documents produced by the various defendants, and organized and catalogued all information gleaned by computer for retrieval by subject categories.

The PLC members participated in and supervised the taking of over 1,400 depositions, in "tracks" of up to 11 depositions in different cities at one time, and prepared summaries of all relevant depositions for the trial of the case. It reviewed every deposition transcript and designated each section expected to be used at trial. The PLC completed all aspects of all waves of discovery in accordance with the MANUAL FOR COMPLEX LITIGATION.

The PLC filed pleadings on behalf of all plaintiffs, including original and amended complaints and all discovery pleadings in state and federal courts across the country and in the United States Court of Appeals for the Ninth Circuit. It was eventually successful in having all claims filed in this court thereby permitting claims which had originally been filed in many federal district and state courts to proceed together. The PLC reviewed and responded to thousands of items of correspondence and pleadings by the defendants and initiated

substantial correspondence and hundreds of pleadings on behalf of all of the 1,000 or so plaintiffs. It prepared and filed extensive motions, applications, and briefs relative to: Nevada's "Statute of Repose;" "choice of law;" bifurcation; punitive damages; discovery; disqualifications; severance, and all of the other relevant aspects of this litigation. As noted above, the PLC prepared the single amended complaint for all plaintiffs' interests. It prepared agendas for and attended all pretrial conferences with this court including weekly and bi-weekly discovery and dispute hearings before the Magistrate, and prepared pleadings for and appeared at more than 225 pretrial hearings over the course of the litigation, including the handling of in excess of 1,000 motions dealing with discovery issues. The PLC coordinated the compilation of damage material in each individual case, participating in the preparation of answers and/or objections to all damage interrogatories.

The PLC was successful in having trial dates set in succession against various groups of defendants in order to conduct the trial in the most expeditious manner. It marshalled over 11,000 relevant documents for trial, prepared dozens of witnesses for trial, prepared an extensive pretrial order and jury trial books. It conducted a demographic jury poll to analyze the likelihood of success in the Nevada courts against selected defendants.

Prior to the "global settlement," claims in excess of $17,500,000.00 were consummated as a result of the PLC's efforts and in February 1982, the PLC was successful in reaching an agreement with two former PLC members, the aforementioned James L. Fetterly and Neil G. Galatz, who were settling all of their personal injury and/or death claim clients' cases for over $14,000,-000.00 to the effect that the PLC would reduce the 7% PLC fee deduction to 5% if the PLC would be permitted to use the 5% to fund the expenses of the litigation. This agreement enabled the plaintiffs, via the PLC, to adequately conduct substantial discovery and other pre-trial functions. In addition, the members of the PLC advanced expense funds on behalf of the plaintiffs of over a million dollars during the pendency of this litigation.

Prior to a global settlement being feasible, it was necessary to reach some agreement with the Kemper Group (American Protection Insurance Company or "AMPICO") in view of the $141,000,000.00 MGM property subrogation claim asserted by that group. Although the "non-MGM" defendants attempted for several months to reach an agreement with AMPICO, they were unsuccessful. The PLC, however, conceived, drafted, amended and implemented a creative and unique joint trial agreement with AMPICO allowing settlement to proceed for the first time. PLC Petition at page 6; Testimony of Thomas Foulds, Esquire at Pretrial Conference No. 19 on October 15, 1986, *Official Transcript MDL No. 453*, pages 127–140. In order to fund the first payment to AMPICO provided for in that agreement, the PLC borrowed $5,000,000.00 at interest from defendant Simpson Timber Company ("Simpson") as one of the conditions of the settlement between the plaintiffs and Simpson. The PLC did not pay back the principal of the $5,000,000.00 loan directly to Simpson. The PLC assisted in developing and settling AMPICO's claim against Simpson since it had been agreed that the plaintiffs and AMPICO would share equally in any recovery obtained from Simpson on AMPICO's claim against Simpson. That claim was settled for $13,500,000.00 approximately two years after Simpson settled with the plaintiffs and made the loan to the PLC. Therefore, AMPICO and the plaintiffs' recovery fund would each receive one-half of the $13,500,000.00 AMPICO–Simpson settlement. That $13,500,-000.00 was generated by Simpson's payment of $8,500,000.00 and the PLC's repayment of the $5,000,000.00 it had borrowed from Simpson. The interest expense on the $5,000,000.00 loan, approximately $800,000.00 according to Simpson's calculation of when the interest charge started to run, was discharged by a $500,000.00 payment negotiated by the PLC. The PLC demonstrated creative negotiating skill seldom seen in cases of this kind.

During the pendency of this action, the PLC, with the participation of the court, was able to confirm a sum of $134,887,-992.00 as the amount needed to settle all of the claims of the 1,084 plaintiff interests. *See* Order No. 375, filed July 12, 1983. It then negotiated settlements with all of the remaining unsettled defendants, in order to fund this amount demanded as the aggregate settlement amount by the plaintiffs. The PLC drafted unique settlement agreements with all defendants that provided for almost every contingency, including indemnity from every plaintiff. The PLC drafted and/or reviewed all receipts and releases and coordinated the execution of those documents by all plaintiffs, including translation of many releases into other languages because of several hundred Spanish-speaking claimants and attorneys, and reviewed every release to ascertain that it had been properly executed. The total amount of the recovery produced by this effort, with interest, is in excess of $205,000,000.00 and was obtained from the various approximately 114 defendants.

After the deposit of the initial funds paid by the defendants in the principal trust, various trust funds were established and supervised by the PLC to satisfy special concerns. It was from these trust funds, following a settlement negotiated by the PLC, that all pending property claims, from damage to merchants' businesses and shops that were located in the arcade area of the hotel (often referred to as "Arcade" claims), were satisfied. A distribution plan was established by the PLC and implemented by a reputable accounting firm hired by the PLC. Throughout this litigation the PLC took a very active part in monitoring the trust, including several hundred telephone calls, much correspondence, and many meetings with the Trustee and members of the accounting firm which the PLC had commissioned to conduct a full-scale audit of the trust.

The PLC has successfully distributed $168,365,198.93 in the four distributions (1983—$108,031,862.17; 1984—$8,333,-336.76; 1985—$12,000,000.00; 1987—$40,-000,000.00). A member of the PLC staff reviewed and confirmed every form and every check issued in the four distributions.

The PLC accepted this case on a contingent fee basis which suggests that the court should consider the contingency factor. For the contingency factor the court must focus on the PLC's legal and financial risk in undertaking this case. The PLC risked nonpayment if the case was lost or if the defendants had a limited amount of insurance or the resources to respond to the claims. This aspect is of particular significance here since early in 1981 it appeared that the principal defendant, MGM, only had a limited amount of insurance and that concern persisted for many months.[5] If the case is a difficult one or is strongly opposed by defense counsel, the risks are obviously higher, especially when opposing counsel are extremely able as was the case here. Also, if, as in this case, the litigation is lengthy and complex, counsel suffers the risk of nonpayment over a longer period of time. The risk, thus, includes the scope of the PLC's professional burden as viewed at the outset, the number of hours expended without guarantee of payment, and the delay in receipt of payment. It is always easy to accurately assess "probability of success" after success has been achieved. That factor, however, must be gauged in the context of the present motion from June of 1981 and not from March, 1987. From that viewpoint, the probability of convincing a jury in June, 1981 that *some* fault would ultimately be found against someone was both an easy and accurate statement to

---

**5.** One of the difficult aspects of the claims by the surviving employees of the hotel and the survivors of the dead employees was the compensation limitations of the Nevada Statutes. This group of claimants could not have recovered had the PLC not developed a substantial body of evidence against non-MGM interests.

At the onset it appeared as though all claims against the original design professionals, contractors and manufacturers of material in the hotel had been barred by the Nevada Statute of Repose.

In view of the limited insurance coverage on the date of the fire, the PLC faced potential bankruptcy proceedings.

make. The probability of determining who among over 100 defendants would be liable to which of the 1,000 or so claimants, for how much money and whether such amount would ever be paid, or how the court system would try all of these cases, was much more improbable than probable.

This was clearly a risky and burdensome venture the PLC embarked upon and the principal beneficiaries have been the plaintiffs. In this effort, the PLC members, their partners, associates, paralegals and the support personnel expended over 77,-500 hours in dedicated and competent service to all plaintiffs that produced an extraordinary result. The court has audited the hours submitted by the PLC members and finds that they are reasonable. The PLC made proper uses of staff to perform non-attorney functions.

Since the PLC was formed the court has monitored the work effort of the PLC members and is confident that the attached PLC fee schedule accurately reflects the contributions each PLC member made over the course of this litigation to that work effort and adequately compensates each PLC member for their respective contributions.

To the court's knowledge, the results of the PLC's efforts have never been equaled in any other mass disaster litigation. Indeed, of the dozens of mass disaster cases that were pending or begun during the pendency of this case, none of them have concluded except this one, and from the court's viewpoint, that says it all.

CONCLUSION

The court determines that an increase in the PLC fees from 5% to 7% of the "global" settlement is plainly warranted and promptly required. To do so will fairly and reasonably compensate the attorneys for their professional labors and also compensate those who have borne considerable long-standing risks. The fees deducted from the pre-global settlement will remain unchanged.[6]

An appropriate Order will be entered.

6.

The total sum available for fees is calculated as follows:

| | | |
|---|---|---|
| (a) 7% of $205,000,000.00 | | $14,350,000.00 |
| (b) All-Flex fee (17% − 7% = 10% of $3,500,000.00—*See* court Order No. 420 filed 3/15/84 | | 350,000.00 |
| (c) Pre-global fees not included in "(a)" above—(*See* court Order No. 417 filed 1/19/83) | | 962,594.00 |
| (d) Fees previously paid | | |
| 1) Court Order No. 420 filed 3/15/84 | $8,694,595.00 | |
| 2) Court Order No. 453 signed 7/31/86 | 59,689.00 | |
| | | 8,754,284.00 |
| Sum available for fees | | $ 6,908,310.00 |

PLAINTIFFS' LEGAL COMMITTEE/MGM LITIGATION
FEE SCHEDULE

| ATTORNEY | $150.00/hr MEMBER | $100.00/hr PARTNER | $75.00/hr ASSOCIATE | $25.00/hr PARALEGAL | $20.00/hr CLERK | TOTAL HOURS | TOTAL DOLLAR VALUE ATTORNEY TIME | MULTIPLE | SUBTOTAL | TOTAL DOLLAR VALUE NON-ATTORNEY TIME | TOTAL FEE | PAID TO DATE | BALANCE DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alverson (hrs) | 809.90 | 35.50 | 667.05 | 195.50 | 81.80 | 1,789.75 | $ 175,064.00 | 1.00 | $ 175,064.00 | $ 6,524.00 | $ 181,588.00 | $ 180,838.00 | $ 750.00 |
| | $ 121,485.00 | $ 3,550.00 | $ 50,029.00 | $ 4,887.50 | $ 1,636.00 | | | | | | | | |
| Belli (hrs) | 38.00 | -0- | 655.85 | 88.00 | 21.30 | 798.15 | $ 54,888.75 | 1.00 | $ 54,889.00 | $ 2,501.00 | 57,390.00 | 54,952.00 | 2,438.00 |
| | $ 5,700.00 | $ | $ 49,188.75 | $ 2,075.00 | 426.00 | | | | | | | | |
| Chesley (hrs) | 4,943.50 | -0- | 6,709.25 | 708.50 | 494.75 | 12,856.00 | $1,244,718.75 | 2.65 | $ 3,298,505.00 | $ 27,608.00 | $ 3,326,113.00 | $2,011,238.00 | $1,314,875.00 |
| | $ 741,525.00 | $ | $ 503,193.75 | $ 17,712.50 | 9,895.00 | | | | | | | | |
| Cotchett (hrs) | 1,005.90 | 12.20 | 2,512.20 | 279.30 | .60 | 3,810.20 | $ 340,520.00 | 1.10 | $ 374,572.00 | $ 6,995.00 | $ 381,567.00 | $ 339,460.00 | $ 42,107.00 |
| | $ 150,885.00 | $ 1,220.00 | $ 188,415.00 | $ 6,982.50 | 12.00 | | | | | | | | |
| Cummings (hrs) | 6,813.67 | 840.50 | 4,007.10 | 3,949.00 | 6,152.31 | 21,762.58 | $1,406,633.00 | 2.95 | $ 4,149,567.00 | $221,771.00 | $4,371,338.00 | $2,368,795.00 | $2,002,543.00 |
| | $1,022,050.50 | $ 84,050.00 | $ 300,532.50 | $ 98,725.00 | $123,046.20 | | | | | | | | |
| Fetterly (hrs) | 461.95 | 471.95 | 127.15 | 560.35 | 1,007.55 | 2,628.95 | $ 126,023.75 | 1.00 | $ 126,024.00 | $ 34,159.00 | $ 160,183.00 | $ 122,375.00 | $ 37,808.00 |
| | $ 69,292.50 | $ 47,195.00 | $ 9,536.25 | $ 14,008.75 | $ 20,151.00 | | | | | | | | |
| Galatz (hrs) | 946.10 | 14.00 | 387.95 | -0- | 389.05 | 1,737.10 | $ 172,411.00 | 1.00 | $ 172,411.00 | $ 7,781.00 | $ 180,192.00 | $ 128,469.00 | $ 51,723.00 |
| | $ 141,915.00 | $ 1,400.00 | $ 29,096.25 | $ | 7,781.00 | | | | | | | | |
| Gauthier (hrs) | 6,687.45 | 3,448.45 | 3,087.22 | 4,384.50 | 1,087.00 | 18,694.62 | $1,579,504.00 | 2.70 | $ 4,264,660.00 | $131,352.00 | $4,396,012.00 | $2,148,532.00 | $2,247,480.00 |
| | $1,008,117.50 | $344,845.00 | $ 231,541.50 | $109,612.50 | $ 21,740.00 | | | | | | | | |
| Kemp (hrs) | 3,334.89 | 4.05 | 2,589.95 | 207.50 | 418.50 | 6,554.89 | $ 694,884.75 | 2.00 | $ 1,889,770.00 | $ 13,557.00 | $ 1,403,327.00 | $ 432,796.00 | $ 970,581.00 |
| | $ 500,233.50 | $ 405.00 | $ 194,246.25 | $ 5,187.50 | 8,370.00 | | | | | | | | |
| Ring (hrs) | 1,568.85 | -0- | 1,692.30 | 164.00 | 56.00 | 3,481.15 | $ 362,250.00 | 1.50 | $ 543,375.00 | $ 5,220.00 | $ 548,595.00 | $ 457,815.00 | $ 90,780.00 |
| | $ 235,327.50 | $ | $ 126,922.50 | $ 4,100.00 | 1,120.00 | | | | | | | | |
| Smith (hrs) | 950.60 | 308.55 | 262.50 | -0- | 8.00 | 1,529.65 | $ 193,132.50 | 1.30 | $ 251,072.00 | $ 160.00 | $ 251,232.00 | $ 208,294.00 | $ 42,938.00 |
| | $ 142,590.00 | $ 30,855.00 | $ 19,687.50 | $ | 160.00 | | | | | | | | |
| Weiner (hrs) | 1,232.25 | 166.50 | 278.00 | 226.00 | -0- | 1,902.75 | $ 222,337.50 | 1.50 | $ 333,506.00 | $ 5,650.00 | $ 339,156.00 | $ 285,494.00 | $ 53,662.00 |
| | $ 184,837.50 | $ 16,650.00 | $ 20,850.00 | $ 5,650.00 | -0- | | | | | | | | |
| Potter (hrs) | 101.50 | | | | -0- | 101.50 | $ 15,225.00 | 1.00 | $ 15,225.00 | | $ 15,225.00 | $ 15,225.00 | -0- |
| | $ 15,225.00 | | | | | | | | | | | | $ |
| TOTAL HRS. | 28,894.56 | 5,301.70 | 22,976.52 | 10,757.65 | 9,716.86 | 77,647.29 | | | | | | | |
| TOTAL AMT | $4,334,184.00 | $530,170.00 | $1,723,239.00 | $268,941.25 | $194,337.20 | | $6,587,593.00 | | $15,148,640.00 | $463,278.00 | $15,611,918.00 | $8,754,283.00 | $6,857,635.00 |

## ORDER

AND NOW, TO WIT, this 17th day of March, 1987, for the reasons stated in the accompanying Memorandum, following a thorough consideration of Plaintiffs' Legal Committee's petition for an award of attorney fees and costs and the answers, objections and affidavits in opposition thereto, and upon full review of the memoranda in support and in opposition thereto, IT IS ORDERED as follows:

1. Plaintiffs' Legal Committee's petition for an award of attorney fees and costs is hereby *granted;*

2. For the reasons and to the extent indicated above and in the accompanying Memorandum, this Order amends paragraph 2 of Pretrial Order No. 75, filed on February 18, 1982;

3. The Trustee, American Bank and Trust Company, shall pay the fees as set forth on the attached schedule;

4. The unused portion of the fund established by Order No. 764, filed December 22, 1986, shall be returned to the individual attorneys at the time of the next distribution; and

5. For the reasons and to the extent indicated above and in footnote 3 of the accompanying Memorandum, this Order amends Order No. 764, filed December 22, 1986.